IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE: § | |
| § | |
| STEPHEN J. BLAKESLEY § | |
| LILLIAN P. BLAKESLEY § | |
| DEBTOR(S) § | CASE NO. 05-33317-H5-7 |
| § | |
| THE CADLE COMPANY § | |
| PLAINTIFF(S) § | ADVERSARY NO. 05-3409 |
| § | |
| VS. § | |
| § | |
| STEPHEN J. BLAKESLEY § | |
| LILLIAN P. BLAKESLEY § | |
| DEFENDANT(S) § | |

**MEMORANDUM OPINION
REGARDING COMPLAINT OBJECTING TO DISCHARGE**

Before the Court is the Complaint of the Cadle Company objecting to the discharge of debtors Stephen Blakesley and Lillian Blakesley pursuant to 11 U.S.C. §§ 727 (a)(3) and (a)(4). This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding. Following a trial, this Court concludes that the complaint must be denied because the Cadle Company failed to carry its burden of proof. The debtors are granted their discharge.

**I. Factual and Procedural Background**

Prior to filing this Chapter 7 bankruptcy case, Stephen Blakesley served as president of S.J. Blakesley Insurance Agency, Inc., a successful multiline insurance agency in Houston, Texas. In 1996, while Mr. Blakesley was still operating his insurance agency, Mr. and Mrs. Blakesley

purchased their first Smoothie King franchise. The Smoothie King operation was run by Nutrition 4 U, Inc., a corporation the Blakesleys incorporated for that purpose.

In 1997, Mr. Blakesley sold his insurance agency to the Farmers Insurance Group, and he and Mrs. Blakesley began to focus more on the Smoothie King business.[1] In 1997 the Blakesleys opened a second Smoothie King store.

In 1998, the Blakesleys entered into development rights with two other companies, Big Apple Bagels and PJ's Coffee. In late 1998, the Blakesleys opened a dual Smoothie King and PJ's Coffee store. Around that time they also opened a Big Apple Bagels store.

By 1999 the franchises were doing well, and the Blakesleys applied for a U.S. Small Business Administration (S.B.A.) loan to further expand their businesses. In 1999, Nutrition 4 U, Inc. secured an S.B.A. loan through Compass Bank in the amount of $543,000.00. Mr. and Mrs. Blakesley personally guaranteed the note.

The Blakesleys' business success, however, did not last. By late 2000, one of the Blakesleys' stores was in financial trouble and draining money from the other stores. The Blakesleys began construction on a new store in a prime location, hoping the new store would boost revenue. However, they lost their financial backing midway through construction.

The Blakesleys decided to liquidate personal assets to help keep their businesses afloat. During their profitable years, the Blakesleys had acquired a number of works of art. The Blakesleys began trying to sell their artwork. The Blakesleys placed pieces on consignment in art galleries, placed ads in newspapers, and opened their home to interested buyers and art dealers.

---

[1] In 1997, Mr. Blakesley also began a financial planning practice, although this practice would wane as the Blakesleys focused more on their franchises, with the practice finally ending in 1999.

It was during this time, in December 2000, that Mr. Blakesley started Global Management Systems, Inc. to provide income for himself and his wife in the future.[2]

By early 2001, all the Blakesleys' franchises were shut down. The Blakesleys defaulted on the S.B.A. loan. In 2002, the S.B.A. assigned the note to The Cadle Company. The Cadle Company sued the Blakesleys to collect the note. *The Cadle Company v. Stephen Blakesley et al., Cause No. 2004-61849; In the 189th Judicial District Court of Harris County, Texas.*

Thereafter, the Blakesleys filed their Chapter 7 bankruptcy petition on March 3, 2005. On May 27, 2005, Cadle conducted a Rule 2004 examination of the Debtors. Cadle filed this adversary proceeding on May 31, 2005. The Blakesleys amended their schedules on September 7, 2005.

## II. Cadle's Complaints

### a. Artwork

Cadle complains that the Debtors' valuation of their artwork is grossly undervalued.

The Blakesleys originally scheduled their art at a value of $355.00. In their amended schedules, the Blakesleys increased the value of the art to $655.00.

Cadle points to a financial statement entitled "Real Estate Schedule" which Stephen Blakesley signed on February 14, 2000 (Plaintiff's Ex. 4-2).[3] In that financial statement the total value of the Blakesley's fine art is listed at $76,500.00. Mr. Blakesley testified that the financial

---

[2]The Blakesleys still operate Global Management Systems, Inc., a Nevada corporation. Global Management is a consulting business that addresses issues affecting business owners and executives. Mr. Blakesley is the only consultant. Mr. Blakesley is also currently an independent contractor with TEC, a consulting group that provides services to CEOs and other business executives.

[3]Mr. Blakesley testified that this "Real Estate Schedule" was indeed part of a financial statement, although it was not prepared to obtain the loan Cadle now holds.

statement in question was signed before the Blakesleys fell on hard financial times. He testified that it was not until the end of 2000 that the Blakesleys began experiencing real financial trouble with their stores, and they began to liquidate assets in order to keep their businesses afloat.

When asked how he and Mrs. Blakesley arrived at the values for this financial statement, Mr. Blakesley testified that the values were based on how much they loved the particular piece of art. Mr. Blakesley testified that three of the oil paintings listed in the 2000 financial statement were sold in an art gallery on consignment for $10,000, with a net of $6,000 to the Blakesleys. In addition, an etching was sold to a gallery for $2,000.[4] Mr. Blakesley testified that a sculpture valued in the 2000 financial statement at $3,500 had been on consignment for two years with instructions to sell at any price. The sculpture never sold. With the exception of the Nieman and Peter Max serigraphs and the Dali etching, the rest of the pieces listed in the financial statement had been placed for sale yet never sold.

Valuation of a debtor's possessions for the purpose of filing bankruptcy schedules is "current market value." *See, e.g., Sullivan*, 204 B.R. 919, 935 (Bankr. N.D. Tex.1997). Mr. Blakesley testified that he applied a current fair market value when completing his original bankruptcy schedules. The generally accepted definition of fair market value is a willing buyer, a willing seller, and a reasonable exposure to market. *In re Mitchell*, 103 B.R. 819, 821, 824 (Bankr. W.D. Tex. 1989). Mr. Blakesley testified that he and Mrs. Blakesley based the low originally scheduled value on their personal experience as to what someone would pay for the artwork in question–nothing. He testified that based on the years the remaining artwork was on the market without selling, he and Mrs. Blakesley believed the fair market value of the artwork to be approximately $350.00. Mr.

---

[4] The $12,000 realized by the sale of these pieces is $22,300 less than their value as listed on the February 14, 2000 financial statement.

Blakesley testified that after their Rule 2004 examination he and Mrs. Blakesley decided to hire an art appraiser because they became concerned that their original art values were controversial and could potentially be incorrect. Mr. Blakesley testified that he and Mrs Blakesley researched appraisers on the Internet and hired someone they believed to be a certified appraiser. Mr. Blakesley further testified that he did not know the hired appraiser before engaging him, nor did he know anything about him other than he appeared to have proper certification.[5] Mr. Blakesley testified that the Blakesleys' art appraiser, L. Scott Morris, appraised the value of the Blakesleys' art at $655 and the Blakesleys amended their schedules accordingly. The Court notes, that despite Mr. Blakesley's recollection that he had hired the art appraiser in order to correct his schedules, the Debtors' appraisal was conducted on October 25, 2005, after Debtors amended their schedules. (Debtors' Ex. 7).

Cadle's art appraiser, Evan Epstein, testified that the fair market value of the artwork remaining in the Defendant's possession is $9,250.00. Six-thousand dollars of the $9,250 figure is attributed to Epstein's valuation of 54" x 62.5" oil painting by Houston artist David Hickman. Mr. Blakesley testified that the Hickman piece was too large a painting to be placed on consignment, so the Blakesleys opened their home to art dealers, estate liquidators, and other parties interested in purchasing the piece. He testified that in the five years the painting was on the market, only 10 to 15 people had come to look at the piece and the Blakesleys had received no offers to buy the painting.

---

[5]At trial, Cadle's art appraiser criticized the Blakesleys' appraiser's credentials because he is not certified by the American Society of Appraisers or the International Society of Appraisers (as Cadle's art appraiser is) and instead is certified by the Certified Appraisers Guild of America, an organization with which Cadle's appraiser was not familiar. The Blakesleys' appraiser's report, however, was admitted into evidence without objection by Cadle. The Court finds that the debtors' appraiser satisfies Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993).

Finally, Cadle complains that in 1999 and 2000, five years prior to Debtors' bankruptcy filing, Debtors gave Mr. Blakesley's son two works of art as a wedding present and sold Mrs. Blakesley's nephew a work of art for $200.00. The Court notes that these gifts occurred prior to the Debtors' financial hard times in late 2000 and early 2001. Cadle has not alleged that Debtors failed to keep adequate records concerning the disposition of these works of art or that Debtors have made a false oath concerning the disposition of these works of art. Therefore, Cadle has failed to raise a cognizable cause of action under § 727 (a)(3) or (a)(4) regarding the disposition of these works of art.

### b. Jewelry

Cadle also complains that the Debtors' failed to list a diamond tennis bracelet in their original schedules and otherwise undervalued their jewelry. The Debtors' original bankruptcy Schedule B lists jewelry with a cumulative value of $1,000. The Debtors' amended Schedule B lists jewelry with a cumulative value of $6,000, including a diamond tennis bracelet valued at $4,600.

During the Rule 2004 examination, Cadle's attorney asked Mrs. Blakesley whether Mr. Blakesley ever bought her any jewelry during their 30-year marriage when they were financially secure. Mrs. Blakesley answered that he had. When asked to specify what jewelry Mr. Blakesley had bought her, Mrs. Blakesley stated that "[i]t's hard to remember because it's just mixed in with the rest of it, costume jewelry." (Plaintiff's Ex. 4, p. 41). When asked if she owned any diamonds, Mrs. Blakesley replied that she did not. Mr. Blakesley, however, clearly recalled giving Mrs. Blakesley a diamond tennis bracelet between five and ten years earlier. (Plaintiff's Ex. 5, pg. 75).

### c. Club Dues and Car Payments

Cadle complains that club dues in the amount of approximately $500 per month and car note payments in the amount of approximately $1,100 per month that are paid by Global Management should have been included as income in Schedule I.

The Debtors testified that they considered the dues paid by Global Management to the Houston City Club and the Briar Club to be business expenses and so did not include these dues as personal income in Schedule I. Mr. Blakesley testified that he uses the Houston City Club exclusively for business and the Briar Club primarily for business.

The Debtors originally included car payments of $1,18.40 in Schedule J, but testified that they omitted these payments from their amended schedules to more accurately reflect their monthly expenditures. Debtors testified that they considered the car payments paid by Global Management to be business expenses and so did not include these payments as personal income in Schedule I. Mr. Blakesley testified that the car he and his wife share is used by him for business purposes, driving it to business appointments and meetings.

### d. Corporate Charter

Cadle complains that Global Management's corporate charter was forfeited on January 1, 2004 and not reinstated until February 8, 2006. Debtors counter that they were unaware that the corporate charter had been forfeited until after their bankruptcy filing.

On January 1, 2004 Nevada's Secretary of State revoked Global Management's corporate charter "for failure to file the Annual List of officers and directors and designation of Resident Agent for the filing period December 2002 to December 2003 and to pay the filing fee and penalty thereon...." (Plaintiff's Ex. 6). Global Management's charter was reinstated on February 8, 2006 and as of that date it has been in "good standing" with the Nevada Secretary of State.

While Nevada law provides that upon revocation of a corporate charter "all the property and assets of the defaulting domestic corporation must be held in trust by the directors of the corporation as for insolvent corporations, and the same proceedings may be had with respect thereto as are applicable to insolvent corporations," Cadle has not introduced any evidence of corporate creditors or corporate assets which should have been scheduled as a result of the revocation of the corporate charter. *See* Nevada Revised Statute § 78.175 (5). Cadle has failed to prove that the lapse of Global Management's corporate charter resulted in additional personal assets or liabilities for the individual Debtors. Likewise, Cadle has not introduced any evidence that Debtors understated the value of their interest in Global Management in Schedule B. Additionally, Cadle has not alleged that Debtors failed to keep adequate records concerning the status of Global Management's corporate charter. Therefore, Cadle has failed to prove a cause of action under § 727 (a)(3) or (a)(4) regarding the status of Global Management's corporate charter.

### e. Blakesley's Monthly Income

Cadle complains that the Debtors cannot adequately explain a banking discrepancy of $1,808.54. According to Global Management's accounting register (which was prepared by the Debtors), on January 1, 2005 there existed a beginning balance of $16,666.02. According to a bank account statement from Republic National Bank[6], however, on January 1, 2005 there existed a beginning balance of $18,474.56. At trial, Mr. Blakesley was unable to explain this discrepancy.

Cadle next complains that the Blakesleys could not adequately explain a $3,000 cash withdrawal from Global Management's account on October 21, 2004. The $3,000 is not listed as income in either the Debtors' bankruptcy schedules or in a summary sheet (prepared by Debtors' counsel (Defendants' Ex. 6)) detailing the income earned by the Blakesleys through Global

---

[6]The account at Republic National Bank is Global Management's only bank account.

Management. At trial, Mr. Blakesley testified that he believed he withdrew the $3,000 to provide himself with cash to take to a business conference, as it is his practice to carry large amounts of cash at such conferences. Mr. Blakesley testified that the $3,000 would therefore be a business expense and not personal income to himself.

Cadle complains that the Blakesleys' monthly income of $3,750.00 as scheduled on Schedule I is too low and should be scheduled as a larger amount. To support this contention, Cadle points to the Blakesleys' 2004 personal income tax return which shows that the Blakesleys received $57,225 in income from TEC as well as $45,862 from Global Management. Cadle also points to $16,000 drawn from Global Management by the Blakesleys in January and February 2005 and complains that it should have been reflected in their Schedule I statement of monthly income.

Mr. Blakesley admitted at trial that according to his tax return, he did indeed receive $57,225 from TEC in 2004. He further testified, however, that all of his compensation from TEC goes immediately into Global Management's bank account and is not used for living expenses by the Blakesleys, and therefore was not included in Schedule I. Debtors testified that their source of monthly income (aside from Mrs. Blakesley's Social Security of $591 per month and Mr. Blakesley's annuity of $714 per month) is what they draw from Global Management. The Court notes that all compensation from TEC is listed in Global Management's Account Register as a deposit to Global Management.

Mr. Blakesley also testified that at the time the bankruptcy schedules were prepared, the Blakesleys' 2004 personal income tax return had not yet been prepared. The Court notes that the Blakesleys' 2004 income tax return was not prepared until October 12, 2005, after both the original and amended schedules had been filed. Mr. Blakesley further testified that because the 2004 income tax return was unavailable, the Debtors relied on their 2003 personal income tax return when preparing their schedules. Schedule I's statement of monthly income requires an "Estimate of

average monthly income;" Mr. Blakesley testified that was what the Debtors provided in their Schedule I, based on their 2003 draws from the company (which the Blakesleys tried to match in 2004). Subsequent to the bankruptcy filing, counsel for Debtors prepared a statement which shows the amounts actually drawn by Debtors in 2004 (according to Global Management's accounting ledger), amounts which averaged $3,922.56 per month. (Defendants's Ex. 6).

Cadle also complains that all draws made from Global Management are identified only as income to Stephen Blakesley in the Debtors' Schedule I, even if a particular draw was made in Lillian Blakesley's name. Mr. Blakesley testified that was done because he and Mrs. Blakesley are married.

Finally, Cadle also complains that Global Management's 2004 gross revenue was at least $300,000, twice the company's gross revenue in 2003. Mr. Blakesley testified that there were additional expenses incurred in generating the increased revenue, including the hiring of an additional employee. Cadle has not introduced any evidence that Debtors understated the value of their interest in Global Management on Schedule B.

### III. 11 U.S.C. § 727 (a)(3)

Cadle argues that the Debtors should be denied a discharge under 11 U.S.C. § 727 (a)(3). Cadle alleges that the "Debtors have failed to provide sufficient information to enable The Cadle Company to determine the true value of Debtor's financial condition." *The Cadle Company's Post-Trial Memorandum,* ¶ 3.

> Section 727 (a)(3) states that a debtor shall be granted a discharge unless
>
> > the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business

transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

As plaintiff, Cadle bears the initial burden to prove that the Blakesleys failed to keep and preserve their financial records and that this failure prevented Cadle from ascertaining the Debtors' financial condition. *See In the Matter of Dennis*, 330 F.3d 696, 703 (5th Cir. 2003). "A debtor's financial records need not contain 'full detail,' but 'there should be written evidence' of the debtor's financial condition." *Id.* (quoting *In re Goff*, 495 F.2d 199, 201 (5th Cir. 1974)). The debtor is required "to take 'reasonable precautions for the preservation of these records.'" *In re Gartner*, 326 B.R. 357, 374-75 (Bankr. S.D. Tex. 2005) (quoting *In re Devine*, 11 B.R. 487, 488 (Bankr. D. Mass. 1981)). "The law does not require an impeccable system of bookkeeping. However, at the very least a debtor has a duty to disclose all of the records available to him." *In the Matter of Terrell*, 46 Fed.Appx. 731 (5th Cir. 2002) (unpublished) (internal citation omitted). Provisions for denying discharge must be construed liberally in favor of the debtor and strictly against the objecting creditor. *In re Sullivan*, 204 B.R. at 938 (citing *First National Bank of Amarillo v. Holmes (In re Holmes)*, 121 B.R. 505, 508 (Bankr. N.D.Tex.1990); *InterFirst Bank Greenville, N.A. v. Morris (In re Morris)*, 58 B.R. 422, 427 (Bankr. N.D.Tex.1986); *Friendly Finance Discount Corp. v. Jones (In re Jones)*, 490 F.2d 452 (5th Cir.1974)).

If the plaintiff satisfies his burden, the defendant "must prove that the inadequacy is 'justified under all the circumstances.'" *Dennis*, 330 F.3d at 703 (quoting *In re Sadler*, 282 B.R. 254, 263 (Bankr. M.D. Fla. 2002)).

Insofar as Cadle alleges that the inability of Mr. Blakesley to adequately explain the banking discrepancy of $1,808.54 is a violation of § 727 (a)(3)[7], the Court is not convinced. It appears to the

---

[7] "The suspicion laying behind the failure to account for monies is that the monies have somehow been secreted away in some hidey-hole, to be retrieved later when all this blows over." *In re Lee*, 309 B.R. 468, 480 n.16 (Bankr. W.D. Tex. 2004).

Court that Cadle's concern is misplaced; it would have been impossible for the Debtors to "secret away" the $1,808.54 in question since the bank accounted for the money. Therefore, the inability of the Debtors to explain the $1,808.54 banking discrepancy is not a violation of § 727 (a)(3).

Insofar as Cadle alleges that the inability of Mr. Blakesley to adequately explain a $3,000 cash withdrawal from Global Management's account on October 21, 2004 is a violation of § 727 (a)(3), the Court disagrees. Based on his demeanor on the stand, the Court finds Mr. Blakesley to be a credible witness and gives great weight to his testimony.[8] The Court is satisfied with Mr. Blakesley's explanation for the cash withdrawal, and given Mr. Blakesley's practice of paying cash at business conventions, finds that the Debtors' lack of records regarding the disposition of the cash withdrawn is justified under all the circumstances. *See Lee*, 309 B.R. at 479-80.

Insofar as Cadle's remaining complaints are allegations of § 727 (a)(3) violations, the Court disagrees. The Blakesleys have provided Cadle with 2003 and 2004 personal federal income tax returns, Global Management's 2003 and 2004 corporate income tax returns, a detailed accounting ledger showing Global Management's financial transactions from January 1, 2004 to February 24, 2005, as well as personal bank account information from April 2004 to February 2005. In addition, there is record of outstanding credit card statements as of the date of bankruptcy, a policyholder annual report for a life insurance policy insuring the life of Mr. Blakesley dated around the time of the bankruptcy filing, Mr. Blakesley's consulting agreement with TEC, and closing documents regarding the sale of the Blakesleys' business property.

Based on the quality and volume of records provided to Cadle during the pendency of the Blakesleys' bankruptcy, Cadle has failed to meet its burden to show that Cadle is unable to ascertain

---

[8] "[D]ue regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. R. Civ. P. 52(a). *See also Dennis*, 330 F.3d at 701.

the Debtors' financial condition due to a lack of financial records. *See Dennis*, 330 F.3d at 703.

### IV. 11 U.S.C. § 727 (a)(4)

Cadle additionally argues that the Debtors should be denied discharge under 11 U.S.C. § 727 (a)(4). Section 727 (a)(4) states in relevant part that the bankruptcy court shall grant the debtor a discharge unless "the debtor knowingly and fraudulently, in or in connection with the case...made a false oath or account"or "presented or used a false claim."

Cadle contends that the discrepancies on the Debtors' schedules show intent on Debtors' part to fraudulently deceive creditors in violation of § 727 (a)(4).

To show violation of § 727 (a)(4), Cadle must prove by a preponderance of the evidence that:

> '(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. ' An omission of an asset can constitute a false oath.

*In re Pratt*, 411 F.3d 561, 566 (5th Cir. 2005) (quoting *In the Matter of Beaubouef*, 966 F.2d 174, 178-79 (5th Cir. 1992)) (citations omitted). In order to be denied a discharge under § 727 (a)(4), the debtor must have known the statement was false and must have made such false statement with the intent to defraud his creditors. *Pratt*, 411 F.3d at 566; *Beaubouef*, 966 F.2d at 178-79. The requisite intent to deceive can be shown by a "reckless indifference to the truth," which can be proven by circumstantial evidence. *Beaubouef*, 966 F.2d at 178; *In the Matter of Sholdra*, 249 F.3d 380, 382 (5th Cir. 2001). Provisions for denying discharge must be construed liberally in favor of the debtor and strictly against the objecting creditor. *In re Sullivan*, 204 B.R. at 938.

After considering the testimony of Stephen Blakesley[9], this Court finds that Stephen Blakesley's testimony was credible and that Debtors lacked the intent to deceive their creditors or the Chapter 7 trustee. No fraudulent intent was shown by Cadle with regard to any alleged errors in Debtors' schedules. Cadle has failed to prove Debtors knew any representations to be false, if made.

### V. Conclusion

Based on the foregoing, Cadle has failed to prove the elements of a failure to keep or preserve financial records under 11 U.S.C. § 727 (a)(3) and has failed to prove the elements of a false oath under 11 U.S.C. § 727 (a)(4). A final judgment will be entered accordingly.

Signed this 21 day of Feb, 2007 at Houston, Texas.

KAREN K. BROWN
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[9]Lillian Blakesley did not appear at trial due to poor health.